**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF PROSPECTIVE LOCATION INFORMATION ASSOCIATED WITH T-MOBILE CELLULAR TELEPHONE NUMBER (267) 304-7715 | No. 2:23-mj-271-KFW |

**AFFIDAVIT IN SUPPORT OF APPLICATION**

I, Thomas Lapierre, being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been a Task Force Officer ("TFO") with the U.S. Drug Enforcement Administration ("DEA") since 2007 and I am presently assigned to the Portland, Maine, office. I have been a police officer since 2002.

2. As a law enforcement officer, I have received specialized training involving the use, possession, packaging, manufacturing, sales, concealment, and transportation of various controlled substances, money laundering techniques, and conspiracy investigations. I am also familiar with federal firearms laws.

3. During my assignment at the DEA, I have participated in narcotics investigations both as a case agent and in a supportive role. I have participated in the arrests of multiple drug traffickers and in interviewing informants and suspects concerning the methods and means of drug traffickers. I have also participated in countless static and mobile surveillance activities and assisted in the execution of

EXHIBIT 1

multiple search warrants and arrest warrants. I am aware based on my training and experience that drug traffickers often possess firearms to protect themselves, their narcotics, and proceeds from narcotics trafficking.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.

## PURPOSE OF AFFIDAVIT

5. I submit this affidavit in support of an application for an order pursuant to Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Section 2703(c)(1)(A), authorizing Special Agents and Task Force Officers of the DEA to ascertain the physical location including but not limited to E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, and data relating to cell towers and sectors that the phone is activating/utilizing given its present location as described in Attachment A (the "Requested Information"), for the cellular telephone assigned call number (267) 304-7715 ("Target Telephone 1" or "TT1"), which is cellular telephone subscribed to, and believed to be used by, Marcus Matthes.

6. In support of this request, I respectfully submit that there is probable cause to believe that Matthes is engaged in drug trafficking and used TT1 in furtherance of his drug trafficking activities.

## FACTS SUPPORTING PROBABLE CAUSE FOR OBTAINING THE REQUESTED PROSPECTIVE LOCATION INFORMATION OVER TT1

7.  On September 21, 2023, a confidential source (CS-1)[1] working with DEA told agents that she was able to purchase controlled substances from a male who went by "Face." As explained below, I believe "Face" to be a name used by Marcus Matthes.

8.  On September 21, 2023, CS-1 placed a recorded phone call to TT1 at the direction of law enforcement officers. During this call, the following exchange occurred:

Matthes: Hello?

CS-1: You here?

Matthes: Yup.

CS-1: Okay. Where do you want me to go?

Matthes: Where you at?

CS-1: I am at [REDACTED].

…

Matthes: How much you got?

CS-1: I need a basket. So, what's the… what's the price of the day?

Matthes: Huh?

CS-1: What's the price of the day?

(U/I)

Matthes: You know I'm doing mine for 125 (U/I)

---

[1] CS-1 has a history of cooperating with a local police department. He/she has no pending federal charges but is facing state felony charges related to a crime of dishonesty. CS-1 has a significant criminal history to include convictions for assault, violation of a protection from harassment order, disorderly conduct, theft for unauthorized taking or transfer, forgery, unlawful possession of scheduled drugs, violating conditions of release, and reckless conduct. No promises have been made to CS-1. CS-1 recently told agents that he/she no longer wishes to provide information to law enforcement.

CS-1: That's fine.  Just making sure.

Matthes: 250 (U/I)

CS-1: Cut it out.  Be nice today

Matthes: 250 a whole slam. Half a slam 125.

CS-1: Just make sure it's straight, okay.  Where do you want me to go?

Matthes: Um, go to um, Sullivan.

…

Matthes: 250 and I don't want no surprises. Okay? 'Cause I don't want no surprises.

9. I believe this call is drug related. Specifically, I believe the following:

   a. CS-1 confirmed that Matthes was in Biddeford and available to meet;

   b. Matthes asked CS-1 how much money CS-1 had;

   c. CS-1 indicated he/she wanted a "basket" – which I know to be code for 3.5 grams of crack cocaine;

   d. CS-1 asked about prices;

   e. Matthes indicated he sold a "whole" (3.5 grams) for $250 and "half" (1.75 grams) for $125;

   f. CS-1 and Matthes agreed to meet on Sullivan Street.

   g. Matthes told CS-1 he did not want any surprises in the transaction.

10. Prior to a transaction, agents searched CS-1 for money and contraband with negative results.  Agents provided CS-1 with United States currency to make the purchase as well as recording equipment

11. While under surveillance by agents, CS-1 walked down Sullivan Street.  CS-1 did not interact with any other people while walking to the meeting location.

Agents then observed CS-1 meet with a male consistent in appearance with Matthes for a brief period.

12. Following the transaction, CS-1 walked back to a pre-determined meeting location while under surveillance by agents. CS-1 did not meet with anyone else while walking to the meeting location. CS-1 relinquished a baggie containing a substance consistent in appearance with cocaine base. CS-1 stated that he/she obtained the substance from "Face."

13. A subsequent field test using a Tru-Narc device was presumptively positive for the presence of cocaine.

14. Following the transaction, I reviewed surveillance cameras in place within the City of Biddeford. The male who met with CS-1 was captured on camera shortly after the transaction. This male is consistent in appearance with a known photograph of Matthes. I also note that Matthes is the subscriber of TT1.

15. Phone data received by the Government indicates that TT1 remains an actively used telephone number.

16. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built

into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

17. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

18. Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.

19. Obtaining the prospective Requested Information for TT1 will assist the DEA and other law enforcement officers in locating TT1 and determining where Matthes conducts his drug business.

20. Pursuant to 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41, it is requested that the Court issue a warrant and Order authorizing the acquisition of the Requested Information and directing T-Mobile, the service provider for TT1, to initiate a signal to determine the location of TT1 on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user of TT1, for a period of thirty (30) days. Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

21. There is "reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result." 18 U.S.C. § 3103a(b)(1). Providing prior notice to the subscriber or user of TT1 would seriously jeopardize the ongoing investigation, as such a disclosure would give those persons an opportunity to change patterns of behavior, notify confederates, or flee. Accordingly, the United States also requests that the precise location warrant delay notification of the execution of the warrant for a period not to exceed 30 days after the end of the authorized period of monitoring (including any extensions thereof), in accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3).

22. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate TT1 outside of daytime hours.

## CONCLUSION

23. Based on the above, I request that the Court issue the requested search warrant.

*Thomas P. Lapierre* (signature)

Thomas Lapierre
Task Force Officer, DEA

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Sep 29 2023

City and state: Portland, Maine

Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
*Printed name and title*